**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| FEENIX PAYMENT SYSTEMS, LLC, | ) | |
| FVP OPPORTUNITY FUND GP, LLC, | ) | |
| FVP OPPORTUNITY FUND II GP, LLC, | ) | |
| FEENIX VENTURE PARTNERS | ) | |
| OPPORTUNITY FUND, LP, FVP | ) | |
| SMITHFIELD, LLC AND KEITH LEE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. N21C-05-099 EMD CCLD |
| | ) | |
| MICHAEL BLUM, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: February 26, 2024[1]
Decided: May 29, 2024

***DECISION AFTER TRIAL***

Daniel A. Griffith, Esq., Whiteford, Taylor & Preston LLP, Wilmington, Delaware, Scott M. Hare, Esq., Jordan N. Winslow, Esq., Whiteford, Taylor & Preston LLP, Pittsburgh, Pennsylvania. *Counsel for Plaintiffs Feenix Payment Systems, LLC, FVP Opportunity Fund GP, LLC, FVP Opportunity Fund II GP, LLC, Feenix Venture Partners Opportunity Fund, LLP, FVP Smithfield, LLC, and Keith Lee.*

John A. Sensing, Esq., Jesse L. Noa, Esq., Andrew M. Moshos, Esq., Potter Anderson & Corroon, Wilmington, Delaware, Andrew Moss, Esq., Kutner Rubinoff & Moss, LLP, Coconut Grove, Florida, David B. Mishael, Esq., David B. Mishael, P.A., Coconut Grove, Florida. *Counsel for Defendant Michael Blum.*

**DAVIS, J.**

## I.   INTRODUCTION

This is a breach of contract and defamation case assigned to the Complex Commercial

Litigation Division of this Court.  Plaintiffs Feenix Payment Systems, LLC (the "Company"),

---

[1] The parties finished post-trial briefing on January 23, 2024 (D.I. No. 165).  Subsequently, Mr. Blum moved to strike (the "Motion to Strike") Feenix's claim for disgorgement damages (D.I. No. 166).  The parties completed briefing on the Motion to Strike on February 26, 2024 (D.I. No. 170).  The Court granted the Motion to Strike on May 16, 2024 (D.I. No. 171).

FVP Opportunity Fund GP, LLC ("Fund I GP"), FVP Opportunity Fund II GP, LLC ("Fund II GP"), Feenix Venture Partners Opportunity Fund, LLP ("Feenix Opp Fund"), FVP Smithfield, LLC, and Keith Lee (collectively, "Feenix")[2] seek relief relating to allegedly defamatory statements in a demand letter sent to their lenders. Feenix contends that Defendant Michael Blum is the party responsible for those statements. Mr. Blum is a former business associate of Feenix.[3]

The Complaint originally set out five separate claims for relief. These were: (i) Breaches of Operating Agreement's Restrictive Covenants (Count I); (ii) Breaches of Separation Agreement's Mutual Non-Disparagement Clause (Count II); (iii) Tortious Interference with Business Expectation (Count III); (iv) Defamation (Count IV); and (v) Defamation Per Se (Count V). After various pre-trial dispositive motions, as discussed below, the parties proceeded to a bench trial on Count II. The trial took place on December 4, 2023 and December 5, 2023. The parties then submitted post-trial briefing and proposed findings of fact and conclusions of law.

## II.      PROCEDURAL BACKGROUND

Feenix filed the Complaint on May 11, 2021.[4] As stated above, the Complaint originally contained five causes of action.

Mr. Blum filed a motion to dismiss on July 16, 2021.[5] Feenix opposed the motion to dismiss. The Court heard argument on October 22, 2021 and then took the motion to dismiss

---

[2] Complaint at ¶¶ 3–9 (hereinafter "Compl. at __") (D.I. No. 1). FVP Smithfield, LLC and Mr. Lee are no longer parties to this civil action. Prior to trial, the Court addressed a stipulation dismissing FVP Smithfield, LLC and Mr. Lee as parties. In error, the Court did not enter the Joint Pretrial Stipulation and [Proposed] Order (hereinafter "Pretrial Stipulation") at the Pre-Trial Conference. To complete the docket, the Court so ordered the Pretrial Stipulation on May 28, 2024 (D.I. No. 172).
[3] *Id.* at ¶ 10.
[4] D.I. No. 1.
[5] D.I. No. 17.

under advisement.[6]  The Court issued an opinion on the motion to dismiss on January 25, 2022.[7]  The Court dismissed Counts III, IV and V.  The Court allowed Counts I and II to proceed.

The parties engaged in discovery.  On February 7, 2022, Mr. Blum moved for summary judgment on Counts I and II.[8]  Feenix opposed summary judgment.  After a hearing, the Court granted Mr. Blum judgment on Count I.[9]  The Court denied the motion as to Count II.

Just prior to the trial, Mr. Blum again moved for summary judgment on Count II.[10]  Mr. Blum argued that summary judgment should be granted because none of the alleged defamatory language was directed at Feenix, Mr. Blum was the wrong party against whom to bring suit; and Feenix had not sufficiently proved damages.  The Court held a hearing on that motion for summary judgment at the Pre-Trial Conference.[11]  On November 30, 2023, the Court held a hearing and issued a bench ruling denying the motion.[12]

### III.    THE TRIAL

The Court held a bench trial (the "Trial") on Count II on December 4, 2023 and December 5, 2023.[13]  The Court then had both parties submit their closing arguments in written form.  The Court received the final post-trial brief on January 23, 2024.[14]

#### A. WITNESSES

During the Trial, the Court heard from and considered testimony from the following witnesses: Keith Lee; Thomas Betts; and Michael Blum.[15]

---

[6] D.I. No. 29.
[7] *Feenix Payment Systems, LLC v. Blum*, 2022 WL 215026  (Del. Super. Jan. 25, 2022) (D.I. No. 31).
[8] D.I. No. 33.
[9] D.I. No. 31.
[10] D.I. No. 136.
[11] D.I. No. 156.
[12] D.I. No. 158.
[13] D.I. No. 160.
[14] D.I. No. 165.
[15] In addition, on December 1, 2023, the Court issued a ruling allowing Feenix to offer deposition admissions made by Mr. Blum under Civil Rule 32.

All witnesses testified on direct and were available for cross-examination. The fact witnesses in this civil action were Mr. Lee, Mr. Betts and Mr. Blum. No expert witnesses testified.

Normally, the Court would list the witnesses in the order they testified and which party called the witness; however, because the Trial was a bench trial, the Court took witnesses out of order and, pursuant to Rule 611 of the Delaware Rules of Evidence, allowed examination of the witness for both parties' cases-in-chief.

## B. CREDIBILITY OF WITNESSES

Here, the Court is the sole judge of each witness's credibility, including the parties.[16] The Court considers each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.[17]

The Court finds that—based on their testimony at the Trial and the factors listed above, Mr. Lee, Mr. Betts and Mr. Blum were credible witnesses. Given the bias of the witnesses, the lack of any independent third-party witnesses (especially anyone from Atalaya) or experts, the Court did not find that the witnesses provided much new information beyond that provided during the dispositive motion phase of this civil action.

## C. EXHIBITS

The parties each submitted a binder of exhibits to the Court prior to the Trail. Feenix submitted Plaintiffs' Exhibits A through J. Mr. Blum submitted Defendant's Exhibits A through

---

[16] *See* Superior Court Civil Pattern Jury Instruction 23.9.
[17] *Id.*

K.  The only objection was to Plaintiffs' Exhibit J.  The Court allowed the admission of Plaintiffs' Exhibit J but limited its use.

## D.  FINDINGS OF FACT

### 1.  *The Parties and their Relationship*

The Company is a Delaware limited liability company.[18]  The Company has its offices and principal place of business in New York, New York.[19]

Fund I GP, is a Delaware limited liability company.[20]  Like the Company, Fund I GP has its principal place of business in New York, New York.[21]

Fund II GP is a Delaware limited liability company with its principal place of business in New York, New York.[22]

Feenix Opp Fund is a Delaware limited partnership, having its principal place of business in New York, New York.[23]

The Company is the parent company of the Feenix entities.[24]  The Company is a holding and operating company that provides credit card processing services for its investment entities or opportunities.[25]

The Feenix entities are affiliates.  Feenix Opp Fund is a private fund managed by Feenix Venture Partners and sponsored by the Company.[26]  Feenix Venture Partners is a subsidiary of

---

[18] Pretrial Stipulation, Part II at ¶ 1.
[19] *Id.*
[20] *Id.* at ¶ 2.
[21] *Id.*
[22] *Id*. at ¶ 3.
[23] *Id*. at ¶ 4.
[24] Dec. 4 Tr. at 27:13-16.
[25] Dec. 4 Tr. at 31:5-8.
[26] Dec. 4 Tr. at 31:5-12.

5

the Company.[27] The Fund I GP and Fund II GP are separate entities primarily owned and sponsored by the partners of the Company.[28]

The Company and the other Feenix entities provided growth capital to small businesses. According to Mr. Lee, Feenix employed investment strategies that funded small businesses with private capital managed by Feenix Venture Partners with credit card processing provided by the Company to get real-time data and transparency on the performance of their investments.[29]

Mr. Lee is the CEO and founder of the various Feenix entities, including the Company.[30]

Mr. Blum is a resident of Florida.[31] Mr. Blum met Mr. Lee in the summer of 2017.[32] At that same time, Mr. Lee was establishing the Company and other Feenix entities, including FVP Smithfield.[33]

According to testimony at the Trial, Mr. Lee invited Mr. Blum to join him at the Company due to Mr. Blum's real estate development and co-working experience.[34] Mr. Blum was to "spearhead" the Company's efforts in the "co-working, co-management space."[35]

In addition to Feenix, Mr. Blum was associated with PBM Partners, LLC ("PBM").[36] PBM engages in commercial real estate development. For all times relevant here, Mr. Blum has been the managing member of PBM.[37]

---

[27] Dec. 4 Tr. at 31:9-12.
[28] Dec. 4 Tr. at 31:17-20.
[29] Dec. 4 Tr. at 30:16-31-12.
[30] Dec. 4 Tr. at 27:17-18.
[31] Compl. ¶ 10; Answer and Affirmative Defenses ¶ 10.
[32] Dec. 4 Tr. at 46:11-14.
[33] Dec. 4 Tr. at 46:11-23; 47:1-3.
[34] Dec. 4 Tr. at 46:8-17.
[35] Dec. 4 Tr. at 47:8-17.
[36] Dec. 5 Tr. at 32:16-17; Pretrial Stipulation, Part II ¶¶ 9-10.
[37] Pretrial Stipulation, Part II ¶ 10.

6

## 2. *Contract Documents*

The Company and Mr. Blum, among others, are parties to an Amended and Restated Limited Liability Company Agreement of the Company dated November 2, 2017, as further amended by a Second Amended and Restated Limited Liability Company Agreement of the Company dated October 31, 2018 (the "Operating Agreement").[38] The Operating Agreement provides the following definitions:

"Affiliate" means with respect to any specified Person, (a) any Person that directly or through one (1) or more intermediaries controls or is controlled by or is under common control with the specified Person, or (b) any Person who is a general partner, member, managing director, manager, officer, director or principal of the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Companies" shall mean, collectively, the Company, each of its Subsidiaries and each of Feenix Venture Partners Opportunity Fund, LP and Feenix Venture Partners, LLC.

"Company" means Feenix Payment Systems, LLC, a Delaware limited liability company.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, unincorporated entity of any kind, governmental entity, or any other legal entity.[39]

Section 15.5 of the Operating Agreement provides, in relevant part, as follows:

15.5 <u>Restrictive Covenants</u>.

(a) Each of the Holders and each Board Member (collectively, the "<u>Restricted Parties</u>") recognizes and acknowledges that such Restricted Party will be entrusted with or have access to confidential and proprietary information which is the property of the Companies and/or third parties to which the Companies owe a duty of confidentiality (whether pursuant to Applicable Law, by contract or otherwise). Each Restricted Party therefore agrees that, at all times while such Restricted Party is a Holder or Manager, and for a period of eighteen (18) months

---

[38] Pretrial Stipulation, Part II ¶ 5; Pl. Ex. A; Pl. Ex. B; Dec. 5 Tr. at 7:13-8:12; Deposition Testimony of Michael Blum at 79:21-80:3 (hereinafter "Blum Depo. at ___").
[39] Pl. Ex. B at 7, 9 and 13.

thereafter, such Restricted Party shall (i) not, without the prior written consent of the Board of Managers, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance of such Restricted Party's duties with respect to the Companies, (ii) take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Companies (or, if applicable, of a third party to which the Companies owes a duty of confidentiality) in the Confidential Information and (iii) not, without the prior written consent of the Board of Managers, utilize or convert Confidential Information for such Restricted Party's own benefit or gain, of whatever nature other than in performance of such Restricted Party's duties with respect to the Companies. As used herein, the term "Confidential Information" shall mean trade secrets and other non-public information, whether tangible or intangible, in any form or medium, relating to the business or affairs of the Companies that is proprietary to the Companies (or relating to the business or affairs of a third party to which the Companies owes a duty of confidentiality) and which the Companies makes reasonable efforts to keep confidential.

* * *

(d) At no time shall any current or prior Restricted Party make any statement, or take any action whatsoever, to disparage, defame, sully, or compromise the goodwill, name, brand, or reputation of any of the Companies or their respective Affiliates (collectively, the "Company Goodwill").[40]

Feenix Payment Systems, FVP Opportunity Fund GP, LLC, FVP Opportunity Fund II GP, LLC and Blum are parties to a Membership Interest Redemption and Release Agreement dated May 7, 2020 (the "Separation Agreement").[41]  The Separation Agreement provides the following definitions:

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such subject Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Company" means Feenix Payment Systems, LLC.

"Feenix Parties" means the Company and the Fund GPs.

---

[40] Pl. Ex. B at § 15.5.
[41] Pretrial Stipulation, Part II ¶ 6; Pl. Ex. C; Dec. 5 Tr. at 13:19 – 14:11; Blum Depo. at 83:16 – 84:10.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, unincorporated entity of any kind, governmental entity, or any other legal entity.

"Companies" shall mean, collectively, the Company, each of its Subsidiaries and each of Feenix Venture Partners Opportunity Fund, LP and Feenix Venture Partners, LLC.

"Company Exculpated Party" is defined as "each of the Company, the Remaining Members, the Fund GPs, and their respective officers, directors, shareholders, members, managers, beneficial owners, trustees, partners, Affiliates, employees, participants, and agents."

"Redeemed Member" is defined as "Michael Blum, an individual."[42]

Mr. Blum received a "Redemption Payment" of $172,829.32 in consideration for executing the Separation Agreement. Specifically, Separation Agreement Section 2(c) states:

Subject to the terms and conditions of this Agreement, on the Closing Date: (i) The Company shall: (a) make payment, by wire transfer of immediately available funds to an account specified in writing by the Redeemed Member, an amount equal to: U.S.$172,829.32, less any applicable Taxes required by law to be withheld (the 'Redemption Payment').[43]

The Separation Agreement obligated Mr. Blum to indemnify and hold harmless Feenix for certain types of claims. Section 6(c) specifies:

The Redeemed Member shall indemnify and hold the Company and the Fund GPs harmless from any and all Claims, arising out of or resulting from, directly or indirectly, (i) any matter arising from or in connection with a breach by the Redeemed Member of the Operating Agreement prior to the Effective Date that constitutes fraud, willful misconduct, or a knowing violation of law by the Redeemed Member; (ii) any breach by the Redeemed Member of any covenant or obligation contained in this Agreement; and (iii) any breach or inaccuracy of any representation, warranty, or covenant by the Redeemed Member contained in this Agreement. Under no circumstances shall the amount of all indemnity payments and costs payable hereunder by the Redeemed Member exceed the amount of the Redemption Payment.[44]

---

[42] Pl. Ex. C at 4-6.
[43] Pl. Ex. C at § 2(c).
[44] Pl. Ex. C § 6(c) (emphasis added).

The Separation Agreement Section 9(a) provided that the Restrictive Covenants in the Operating Agreement survived the execution of the Separation Agreement:

> The Parties expressly acknowledge that Section 15.5 of the Operating Agreement and Section 15.5 of the operating agreements of the Fund GPs survive the execution of this Agreement, with the sole exception being Subsection 15.5(e) of the Operating Agreement, which is void and of no further force or effect.[45]

Mr. Blum, as a "Redeemed Member," agreed not to make any statement, whether oral or written, or to take any action to disparage or defame Feenix. Separation Agreement Section 11 sets out that:

> At no time shall any Redeemed Member make any statement, whether orally or in written form, or take any action whatsoever, to disparage or defame any of the Companies, the Company Affiliates or any Company Exculpated Party (as such terms are defined in the Company Operating Agreement). Likewise, the Feenix Parties, and their respective current members, officers, employees, and agents, shall not make any statement, whether orally or in written form, or take any action whatsoever to disparage or defame the Redeemed Member, Redeemed Member Exculpated Parties and Redeemed Member Releasors. Nothing in this paragraph or this Agreement shall be deemed to preclude the Company, the Company's Affiliates, any Company Exculpated Party, Redeemed Member, Redeemed Member Exculpated Parties and Redeemed Member Releasors from providing truthful testimony or information pursuant to subpoena, court order, or similar legal process, or from providing truthful information to governmental or regulatory agencies.[46]

The Separation Agreement has a fee shifting provision, providing:

> The substantially prevailing party in any action or proceeding relating to this Agreement will be entitled to receive an award of, and to recover from the other party or parties, any fees or expenses incurred by him, her or it (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any such action or proceeding.[47]

---

[45] Pl. Ex. C § 9(a).
[46] Pl. Ex. C § 11; *see also* Pretrial Stipulation, Part II ¶ 6 (stipulating that the Separation Agreement contains a "Mutual Non-Disparagement" provision).
[47] Pl. Ex. C § 13(f).

Separation Agreement Section 13(f) specifies that Delaware law applies to construe and enforce the Separation Agreement.[48]

### 3. THE LEASE, LOAN AGREEMENT, AND SALE[49]

In December 2017, PBM Partners LLC and FVP Smithfield entered an office lease for two properties in Pittsburgh, Pennsylvania (collectively, the "Building").[50]  PBM was the "Landlord" and FVP Smithfield was the "Tenant."[51]  FVP Smithfield added valuable furniture, fixtures, and equipment ("FF&E") to the Building during its tenancy.[52]

In April 2019, Feenix Opp Fund and FVP Smithfield entered into a Loan Agreement with Atalaya Capital Management ("Atalaya")[53] and their administrative agent, Midtown Madison Management LLC ("Midtown").[54]  As part of the Loan Agreement, Midtown filed a U.C.C. Financing Statement against debtor FVP Smithfield.[55]  The lien covered all of FVP Smithfield LLC's assets, including the Building and the FF&E.[56]

Pursuant to the Loan Agreement, Midtown executed a notice of senior security interest in the assets of FVP Smithfield LLC in August 2020.[57]  The notice advised PBM that "this letter constitutes formal written notice to Landlord of Agent's senior secured security interest in the FVP Smithfield LLC's assets.  Landlord is hereby requested not to take any action against it, or

---

[48] *Id.* ("This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without regard to conflicts of law principles").

[49] Feenix and Mr. Blum did not include any findings of fact concerning: (i) the lease between PBM Partners LLC and FVP Smithfield; or (ii) the UCC Sale.  These facts provide a context to the December 18 Letter (as defined below).  The Court does not consider these facts to be at issue or integral to the decision on Count II.  Accordingly, this Decision cites facts from *Feenix Payment Systems, LLC v. Blum*, 2022 WL 215026, at *2  (Del. Super. Jan. 25, 2022).

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

11

institute any proceeding with respect to, all or any part of the FVP Smithfield LLC's assets."[58] Lenders' attorneys sent the notice to Mr. Blum.[59]

In October 2020, Midtown issued a notice of private sale (the "UCC Sale") for the FF&E.[60] The notice stated that the sale was being held to enforce the rights of the Secured Party.[61] Subsequently, Feenix Opp Fund purchased the FF&E for $250,000 in November 2020.[62] Immediately thereafter, Feenix Opp Fund (through Mr. Lee) emailed Mr. Blum to advise him of the sale.[63]

Despite having notice of the private sale, neither Mr. Blum nor anyone else on behalf of PBM attended the UCC Sale.[64]

### 4. Atalaya Facility

Prior to December 2020, Atalaya Capital Management ("Atalaya") was a secured lender of FVPOF (the "Atalaya Facility").[65] Atalaya perfected its security interest under the Atalaya Facility by recording a UCC-1 financing statement.[66]

The Atalaya Facility provided terms governing a technical default.[67] FVPOF was unable to make quarterly distributions to its investors while still indebted pursuant to the Atalaya Facility.[68]

---

[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] Dec. 5 Tr. at 36:3-12.
[65] Pl. Ex. G.
[66] *Id.*
[67] Pl. Ex. D at FEENIX_BLUM000341.
[68] *Id.*; *see also* Dec. 4 Tr. at 81:16-82:1.

### 5. *Refinancing Through PAAMCO*

On or around December 16, 2020, FVPOF finalized the proposed terms for a new debt facility (the "Refinanced Facility") with Prisma Pelican Fund LLC ("PAAMCO").[69] The Refinanced Facility contained terms that were substantially the same as the Atalaya Facility, including the interest rate and the fee share percentage. [70]

According to Feenix, the Refinanced Facility provided marked advantages to Plaintiffs, including the removal of the technical default provision that was in the Atalaya Facility.[71] Under the Refinanced Facility, FVPOF would be able to make quarterly distributions to its investors.[72]

On December 16, 2020, Mr. Lee sent an email (the "December E-Mail") to FVPOF's investors, seeking majority approval of the Refinanced Facility, which was scheduled to close by Friday, December 18, 2020.[73] Mr. Lee copied the December E-Mail to the members of FVPOF including Jeffrey Blum.[74]

On December 17, 2020, Jeffrey Blum—Mr. Blum's father—forwarded Mr. Lee's December 16, 2020 email to an email recipient identified as "Flopsea 1962 W."[75] "Flopsea 1962 W" is the email pseudonym for Mr. Blum.[76]

By December 18, 2020, the majority of investors voted in favor of the Refinance Facility, and the signature pages were held in escrow pending closing, which occurred on December 21, 2020.[77]

---

[69] Dec. 4 Tr. at 85:20 – 86:2.
[70] Pl. Ex. D, at FEENIX_BLUM000341; Dec. 4 Tr. at 86:7-10.
[71] Pl. Ex. D, at FEENIX_BLUM000341.
[72] Pl. Ex. D, at FEENIX_BLUM000341; Dec. 4 Tr. at 86:17-20.
[73] Pl. Ex. D, at FEENIX_BLUM000341; Dec. 4 Tr. at 85:20 – 86:2, 90:6-10.
[74] Pl. Ex. E, at BLUM_4/18/23_0065; Dec. 4 Tr. at 89:13-23.
[75] Pl. Ex. E, at BLUM_4/18/23_0065; Dec. 4 Tr. at 90:1-5.
[76] Dec. 5 Tr. at21:3-6.
[77] Pl. Ex. D, at FEENIX_BLUM000341; Dec. 4 Tr. at 86:21-87:8.

### 6. *The December 18, 2020 Letter*

Mr. Blum was already aware of the UCC Sale. First, Mr. Blum had seen the August 14, 2020 letter from Midtown.[78] The August 14, 2020 letter gave notice to Mr. Blum of the senior security interests in the assets of FVP Smithfield, including the FF&E later referenced in the December 18, 2020 Letter.[79] Mr. Blum knew the notice of the UCC Sale was October 30, 2020.[80]

Jeffrey Blum provided Mr. Blum with the December E-Mail on December 17, 2020.[81] Mr. Blum provided the December E-Mail to Jacob Frenkel.[82] Mr. Frenkel is an attorney who has represented Mr. Blum.[83] As relevant here, Mr. Blum retained Mr. Frenkel.[84]

On December 18, 2020, Mr. Frenkel sent a letter to Atalaya (the "December 18 Letter").[85] Mr. Blum reviewed the December 18 Letter and authorized Mr. Frenkel to send it.[86] The December Letter contains allegations that Mr. Blum now concedes are "offensive."[87] The December 18 Letter, in part, states:

> I write in connection with what appears on paper to be Atalaya's affiliate Midtown Madison Management LLC / Midtown Management LLC . . . participating in a possible sham $250,000 transaction and fraudulent claim of security interest to defraud PBM.
>
> I characterize the transaction as I do because it is unfathomable that Atalaya, if the transaction in fact is a fraud as it appears, would put the fund and its investors at risk by involving itself in such conduct.
>
> Pursuant to a document captioned Bill of Sale and Assignment bearing the date December 1, 2020, Atalaya supposedly sold the FF&E at the Leased Premises to

---

[78] Blum Depo. at 44:6-22; Def. Ex. G; Dec. 5 Tr. at30:13-19.
[79] Dec. 5 Tr. at32:2-5.
[80] Pl. Ex. G; Def. Ex. D; Blum Depo. at 53:5-17; Dec. 5 Tr. at 32:20-33:10; 33:20-34:8.
[81] Blum Depo. at 32:4-12; Dec. 5 Tr. at 20:22 – 21:2.
[82] Blum Depo. at 32:2-8, 32:4-12; Dec. 5 Tr. at 23:4-8.
[83] Blum Depo. at 33:7-11, 34:4-7; Dec. 5 Tr. at 17:7-9.
[84] Blum Depo. at 33:7-11; Dec. 5 Tr. at 17:2-6.
[85] Pretrial Stipulation, Part II ¶ 12; Dec. 5 Tr. at 23:12-19.
[86] Blum Depo. at 38:11-24; Dec. 5 Tr. at 23:20 – 24:9.
[87] Dec. 5 Tr. at 26:8-13.

Feenix Venture Partners Opportunity Fund, LP . . . for the sum of $250,000. The named signatory on the Bill of Sale is that of Midtown identifiable on Atalaya's website as an Atalaya Partner. Regardless of the legal impropriety of selling FF&E owned by another and for which that other party had in place a valid security interest, Atalaya should have possession, custody and control of a record reflecting receipt on or about December 1, 2020 of a payment of $250,000 from FVP. PBM's suspicion is no such transaction record exists at Atalaya.

And, with respect to the represented sale price of $250,000, the value of the entire FF&E is substantially less than $250,000. This was not a bona fide purchase and sale.

On August 14, 2020, prior to the sale, Holland & Knight, acting for [Lenders], sent a letter to PBM purporting to describe a Loan and Security Agreement dated April 24, 2019 (the "Loan Agreement") between Atalaya and [FVP] Smithfield (the "August 14 Letter"). According to the August 14 Letter, [FVP] Smithfield granted to Atalaya, through the Loan Agreement, a first priority security interest in all of [FVP] Smithfield's Assets. If such a transaction lacking credulity took place, then it is between Atalaya and Holland & Knight as to why there was no UCC-1 filing. What matters is that PBM holds a security interest in the FF&E as evidenced by the Lease and [a 2020 Pennsylvania] UCC-1 filing, and the Lease predates Atalaya 's alleged loan to [FVP] Smithfield by over a year. Thus, contrary to the assertions in the August 14 Letter, Atalaya does not have a first priority security interest in the [FVP] Smithfield FF&E. And, Atalaya and Holland & Knight would be equally culpable for misrepresentations, given that Holland & Knight acted for and with the actual authority of Atalaya.

Our suspicion is Lee solicited or induced Midtown and Atalaya's participation in this sham transaction and unlawful sale for the sole purpose of harassing PBM.

What is shocking, if our suspicion is correct, is the disproportionate legal and regulatory consequence to Atalaya and Midtown of Atalaya, as well as Holland & Knight, willingly joining Lee's apparent scheme to defraud PBM. Holland & Knight could not possibly have performed due diligence or complied with Pennsylvania law to advance Lee's scheme and harassment campaign against PBM. If our analysis is correct, then Atalaya and its attorneys impaired PBM's secured property rights and lien, tortuously interfered with PBM's contractual rights and engaged in the tort equivalent of (at a minimum) wire fraud.[88]

The December Letter also contained the following statement:

Additionally, we have learned that today, December 18, 2020, [New Lender] is scheduled to replace Atalaya as creditor for [Feenix Opp Fund]. Investors of PBM, who also are limited partners in [Feenix Opp Fund], are questioning whether the fund [Feenix Opp Find] had any legitimate business purpose in the first place for

[88] Pl. Ex. F.

acquiring used office furniture for a grossly inflated price during a pandemic. Indeed, according to a [Feenix Opp Fund] Summary of Terms for Debt Financing, no equity is attributed to [FVP] Smithfield, notwithstanding that [Feenix Opp Fund] purportedly paid $250,000 for the [FVP] Smithfield FF&E.[89]

Atalaya's counsel responded by letter dated December 22, 2020. [90] Mr. Frenkel sent Mr. Blum Atalaya's December 22, 2020 letter, including the April 24, 2019 UCC financing statement.[91] Mr. Frenkel and Atalaya's counsel exchanged additional letters on December 22, 2020.[92]

Mr. Frenkel sent the December 18 Letter only to Atalaya.[93] While the PAAMCO transaction is mentioned in the December 18 Letter, the record does not demonstrate that any term sheet with PAAMCO was included in this letter. Feenix sent the December 18 Letter to PAAMCO.[94]

### 7. *Lender Response and Escrow Demand*

In December 2020, Feenix Venture Partners Opportunity Fund, LP refinanced the Atalaya Facility which allowed for a payoff of the debt to Atalaya.[95] Specifically, on December 21, 2020, Feenix Opp Fund closed on the refinance facility.[96]

Despite the refinancing and the availability of funds to pay off the Atalaya Facility, Atalaya required a $50,000 holdback.[97] Mr. Lee confirmed that the holdback reserve was a new term, added in response to the December 18 Letter.[98] From the $50,000 holdback, Atalaya

---

[89] *Id.*
[90] Pl. Ex G; Pretrial Stipulation, Part II ¶ 15.
[91] Blum Depo. at 43:5-12. Dec. 5 Tr. at 23:20-24:9.
[92] Pl. Ex. H, I; Pretrial Stipulation, Part II ¶ 15.
[93] Dec. 5 Tr. at 23:15.
[94] Dec. 4 Tr. at 121:17-23.
[95] Dec. 4 Tr. at 213:11-214:1.
[96] Dec. 4 Tr. at 213:15-22.
[97] Dec. 4 Tr. at 213:11-214:1; Def. Ex. J (payoff letter adding "Holdback Reserve ('Reserve'): $50,000" as a new term).
[98] Dec. 4 Tr. at 118:10-16.

withheld sums that were attributed to legal fees payable to its law firm, Holland & Knight LLP.[99]

Feenix contends that the holdback was solely attributable to the December 18 Letter.

Although Plaintiffs were refunded a portion of the $50,000 holdback, a balance of

$11,673.18 was not refunded. [100]   Again, Feenix contends that the unrefunded portion is

attributable to the December 18 Letter.[101]

## IV.      APPLICABLE LAW

The Court will be applying the following general legal principles:

### A.  GOVERNING SUBSTANTIVE LAW

Delaware law applies here.  First, the Operating Agreement is governed by Delaware law.

Operating Agreement Section 19.2(b) provides, in relevant part, that the agreement "…will be

governed by and construed in accordance with the laws of the State of Delaware."  Moreover, the

Separation Agreement, Section 13(e), states that:

> The parties irrevocably consent to jurisdiction and venue of the state and federal
> courts located in Delaware in connection with any action relating to this Agreement
> and agree that service of summons, complaint or other process in connection with
> any such action may be made as set forth in Section 19.3 of the Operating
> Agreement and that service so made will be as effective as if personally made in
> the State of Delaware.

### B.  BREACH OF CONTRACT

Under Delaware law, to prove a breach of contract claim, a party must show: "(1) a

contractual obligation; (2) a breach of that obligation; and (3) resulting damages."[102]  A party

harmed by a breach of contract is entitled to compensation that will place that party in the same

position that the party would have been in if the other party had performed under the contract.[103]

---

[99] *See generally* Pl. Ex. J.
[100] Dec. 4 Tr. at 214:7-215:18; Pl. Ex. J, at 00031.
[101] Dec. 4 Tr. at 236:8-18.
[102] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005).
[103] *See E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445-46 (Del. 1996).

The standard remedy for breach of contract is based upon the reasonable expectations of the contracting parties.[104] Expectation damages are measured by determining "the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[105] "Damages for a breach of contract must be proven with reasonable certainty. Recovery is not available to the extent that the alleged damages are uncertain, contingent, conjectural, or speculative."[106]

## C. BURDEN OF PROOF BY A PREPONDERANCE OF THE EVIDENCE

In a civil case, the burden of proof is by a preponderance of the evidence. Proof by a preponderance of the evidence means proof that something is more likely than not. This means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not. If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and the Court must find against the party on that point.[107]

In deciding whether any fact has been proved by a preponderance of the evidence, the Court may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.

In this particular case, Feenix carries the burden of proof by a preponderance of the evidence on Count II.[108]

---

[104] *See Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).
[105] *Id.*
[106] *Lee-Scott v. Shute*, 2017 WL 1201158, at *7 (Del. Com. Pl. Jan. 30, 2017).
[107] Superior Court Civil Pattern Jury Instruction 4.1.
[108] *See, e.g.*, *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *Oberly v. Howard Hughes Medical Inst.*, 472 A.2d 366, 390 (Del. Ch, 1984) (same).

## D. EVIDENCE EQUALLY BALANCED

If the evidence tends equally to suggest two inconsistent views, neither has been established. That is, where the evidence shows that one or two things may have caused the breach/damages: one for which a party was responsible and one for which a party was not. The Court cannot find for the party carrying the burden of proof if it is just as likely that the breach/damages was caused by one thing as by the other.[109]

## V. DISCUSSION

### A. MR. BLUM BREACHED THE SEPARATION AGREEMENT.

The Court finds that Feenix has carried its burden in proving that Mr. Blum breached the Separation Agreement.

First, Feenix has demonstrated that Mr. Blum and Feenix were parties to valid contracts—the Operating Agreement and the Separation Agreement. The Court notes that the parties did not dispute these facts at the Trial.

In 2017, Mr. Blum entered into the Operating Agreement. The Operating Agreement defined Mr. Blum as a "Restricted Party" who need to abide by various Restrictive Covenants.[110] Under one Restrictive Covenant, Mr. Blum agreed not to:

> [M]ake any statement, or take any action whatsoever, to disparage, defame, sully, or compromise the goodwill, name, brand, or reputation of any of the Companies or their respective Affiliates.[111]

Under another Restrictive Covenant, Mr. Blum agreed not to

> [W]ithout the prior written consent of the Board of Managers, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance of such Restricted Party's duties with respect to the Companies . . . [and] not, without the prior written consent of the Board of Managers, utilize or convert Confidential

---

[109] Superior Court Civil Pattern Jury Instruction 4.2.
[110] Pl. Ex. B. Op. Agreement at §15.5(d).
[111] Pl. Ex. B. Op. Agreement at §15.5(a).

19

Information for such Restricted Party's own benefit or gain, of whatever nature other than in the performance of such Restricted Party's duties with respect to the Companies.[112]

On May 7, 2020, Mr. Blum and Feenix entered into the Separation Agreement.[113] The Separation Agreement provided that the Restrictive Covenants in the Operating Agreement survived the execution of the Separation Agreement.[114] In the Separation Agreement, Mr. Blum also agreed that:

> At no time shall [Mr. Blum] make any statement, whether orally or in written form, or take any action whatsoever, to disparage or defame any of the Companies, the Company Affiliates or any Company Exculpated Party (as such terms are defined in the Company Operating Agreement).[115]

Second, the Court finds that Mr. Blum breached the Separation Agreement. The December 18 Letter makes allegations of frauds and/or "sham transactions."[116] The December 18 Letter specifically refers to FVP Smithfield, LLC (calling it "Feenix-Smithfield") as one participant.[117] In addition, the December 18 Letter goes on to state:

> Our suspicion is [Mr.] Lee solicited or induced [Mr.] Chan and Atalaya's participation in this sham transaction and unlawful sale for the sole purpose of harassing PBM. What is shocking, if our suspicion is correct, is the disproportionate legal and regulatory consequence to Atalaya and [Mr.] Chan of Atalaya, as well as Holland & Knight, willingly joining [Mr.] Lee's apparent scheme to defraud PBM. Holland & Knight could not possibly have performed due diligence or complied with Pennsylvania law to advance Lee's scheme and harassment campaign against PBM. If our analysis is correct, then Atalaya and its attorneys impaired PBM's secured property rights and lien, tortuously interfered with PBM's contractual rights and engaged in the tort equivalent of (at a minimum0 wire fraud.[118]

---

[112] Pl. Ex. B. Op. Agreement at §15.5(a).
[113] Pl. Ex. C. Separation Agreement.
[114] Pl. Ex. C. Separation Agreement at §9.
[115] Pl. Ex. C. Separation Agreement at §11.
[116] Pl. Ex. F. December 18 Letter.
[117] Pl. Ex. F. December 18 Letter at 1.
[118] Pl. Ex. F. December 18 Letter at 3.

Mr. Blum hired the author, Mr. Frenkel, of the December 18 Letter.[119]  In addition, Mr. Blum authorized the sending of the December 18 Letter.[120]  The Court finds that the December 18 Letter disparages FVP Smithfield, LLC and Mr. Lee by accusing them of engaging in a "fraud," a "sham transaction," and a "scheme and harassment campaign."[121]  Perhaps obviously, accusing someone of committing such acts disparages them.  Moreover, such comments would be disparaging even if true and, here, there is no evidence that the comments are true.  Mr. Blum approved the disparaging characterizations of FVP Smithfield and Mr. Lee after contractually agreeing not to "make any statement" disparaging Feenix, Feenix's affiliates and/or Mr. Lee.  Mr. Blum, therefore, breached the Separation Agreement.

Third, the Court finds that Mr. Blum breached the Separation Agreement by disclosing to Atalaya that Feenix intended to close a new financing arrangement with PAAMCO.  Mr. Blum agreed in the Operating Agreement and the Separation Agreement not to disclose "Confidential Information."[122]  Confidential Information is defined broadly and includes non-public information relating to the business affairs of Feenix.[123]

Mr. Blum, within eighteen months after separation, came into proprietary information of Feenix when Jeffery Blum forwarded information to him relating to the PAAMCO financing on December 17, 2020. [124]  Mr. Blum then made Mr. Frenkel aware of the transaction so that Mr. Frenkel could include it in the December 18 Letter.  Besides making outrageous accusations against Atalaya, Atalaya's counsel, Mr. Lee and Feenix, Mr. Frenkel gratuitously mentions the

---

[119] Blum Depo. at 33:7-11; Dec. 5 Tr. at 17:2-6.
[120] Blum Depo. at 38:11-24; Dec. 5 Tr. at 23:20-24:9.
[121] Pl. Ex. F.
[122] Pl. Ex. B. Op. Agreement at §15.5(a); Pl. Ex. C.  Separation Agreement at §9.
[123] Pl. Ex. B. Op. Agreement at §15.5(a).
[124] Pl. Ex. E.

PAAMCO replacement financing even though the facility apparently has nothing to do with the UCC Sale.[125]

The why is unclear but the reality is that Mr. Blum obtained and then authorized Mr. Frankel to disclose Confidential Information of Feenix to Atalaya, a third party. Atalaya may have known that Feenix was replacing Atalaya's facility with a new facility with PAAMCO; however, whether Atalaya knew of the PAAMCO financing is not relevant as to whether Mr. Blum disclosed the information in breach of his obligations under the Operating Agreement and Separation Agreement.

### B. FEENIX HAS LARGELY FAILED TO PROVE DAMAGES RELATED TO THE BREACHES.

Feenix seeks a wide range of damages for Mr. Blum's breaches of the Operating Agreement and the Separation Agreement. Specifically, Feenix seeks damages related to: (i) Atalaya's holdback and charge to an escrow; (ii) actual damages; and (iii) general and reputational damages.[126] The Court finds that Feenix has failed to carry its burden as to damages with the exception of $11,212.50 in reimbursement costs to Atalaya in connection with the December 18 Letter.[127] The Court finds all other requests for damages too speculative and otherwise not supported by evidence adduced at the Trial.

In Delaware, "[d]amages for a breach of contract must be proven with reasonable certainty. Recovery is not available to the extent that the alleged damages are uncertain, contingent, conjectural, or speculative."[128] The record is bereft of evidence on damages other than the Atalaya charge against the escrow. Mr. Lee testified on damages, but his testimony was

---

[125] Pl. Ex. F. December 18 Letter at 3.
[126] As noted above, Feenix also sought disgorgement damages; however, the Court granted the Motion to Strike as to these types of damages (D.I. No. 171).
[127] Pl. Ex. J. Legal Bills of Holland & Knight. The Court does not consider Pl Ex. J for the truth of the matter asserted. Instead, Mr. Lee testified that he allowed Atalaya to charge the escrow in the amount of $11,212.50. Pl. Ex. J, therefore, is being used for purposes other than admissible hearsay such as the "effect on listener," etc.
[128] *Lee-Scott v. Shute*, 2017 WL 1201158, at *7 (Del. Com. Pl. Jan. 30, 2017).

22

general and not supported by other evidence or expert testimony. For example, Mr. Lee talked about Feenix's reputational damage in the community and the inability to transact additional business with Atalaya. However, Mr. Lee could not quantify the damage and no one from Atataya testified on why it no longer did business with Feenix. Without more, the Court would only be speculating as to Feenix's claims for actual, general, and reputational damages.

Feenix did not meet its burden on damages except as to the Atalaya reimbursement.[129] The Court, when acting as the fact finder, cannot award damages based on mere speculation or conjecture when a plaintiff fails to adequately prove damages.[130] Moreover, the Court notes that the mere breach of a contract is insufficient for a damages award if the Court has no basis to make a responsible estimate of damages.

## C. THE COURT FINDS THAT NEITHER FEENIX NOR MR. BLUM ARE ENTITLED TO ATTORNEYS' FEES AND COSTS.

The Separation Agreement contains the following provision:

> The **substantially prevailing party** in any action or proceeding relating to this Agreement will be entitled to receive an award of, and to recover from the other party or parties, any fees or expenses incurred by him, her or it (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any such action or proceeding.[131]

While each party has been "successful" in this civil action, the Court finds that neither party is a "substantially prevailing party."

Feenix contends it is the substantially prevailing party because it proved that Mr. Blum breached the Operating Agreement and the Separation Agreement. Mr. Blum argues he is the prevailing party because Feenix was successful only on Count II and with limited damages.

---

[129] *See eCommerce Indus. v. MWA Intel, Inc.*, 2013 WL 5621678, at *19 (Del. Ch. Sept. 30, 2013) (damages are a necessary element of a breach of contract claim and require proof by a preponderance of the evidence).
[130] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020).
[131] Pl. Ex. C. Separation Agreement at §13(f) (emphasis added).

23

Mr. Blum refers the Court to *Dreisbach v. Walton*[132] to support his position.  In *Dreisbach*, the Court noted that plaintiffs' success "was limited in both the monetary amount recovered and in the number of claims on which Plaintiffs prevailed."[133]  The *Dreisbach* court explained that an award of less than 7% of the alleged damages "does not quantify as substantial success."[134]   After reviewing the law, the *Dreisbach* court noted that the decision to award fees under a contract provision is not a mathematics exercise but, rather, a review of the success obtained.[135]

Using the guidance set out in *Dreisbach*, the Court finds that neither Feenix nor Mr. Blum can claim they substantially prevailed.  Feenix has demonstrated that Mr. Blum breached the Operating Agreement and the Separation Agreement, but the damage award is limited.  Mr. Blum has successfully fought off a majority of the claims but, nonetheless, breached clear and unambiguous contractual obligations without any real justification.  Under these realities, the Court finds that no one has "substantially prevailed," especially in a manner that would reward them with an entitlement of attorneys' fees and costs.

## VI.    CONCLUSION

The Court awards judgment in favor of Feenix on Count II.  The amount of damages is $11,212.50 plus applicable prejudgment interest.  Feenix may also seek additional recovery under Civil Rule 54.

Dated: May 29, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress

---

[132] 2014 WL 5426868 (Del. Super. Oct. 27, 2014).
[133] *Id*., at *7.
[134] *Id*.
[135] *Id.*, at *6.

24